UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

SHAMIR LEFLORE,

    Plaintiff,

v.

COUNTY OF ALBANY, CORRECTIONAL MEDICAL
CARE, INC., EMRE UMAR, AZAZ HAIDER-SHAH,
M.D., facility physician, SILVER NOAHSON
MASABA, M.D., facility physician, ANNA PAULINO,
Nurse Practitioner, CRAIG APPLE, Sheriff,
CHRISTIAN CLARK, Superintendent,

    Defendants.

**FIRST AMENDED COMPLAINT**

Index No.: 9:14-cv-932
(GTS/TWD)

---

The Plaintiff, Shamir Leflore, by and through his attorney, Jessica M. Gorman, complains and alleges of the Defendants as follows:

## INTRODUCTION

1. This action seeks redress for the deprivation by Defendants, acting under color of law, of rights guaranteed to the Plaintiff under the United States Constitution and federal law. The Defendants deprived the Plaintiff of these guaranteed rights by failing to provide appropriate medical care of Plaintiff's serious medical injuries, resulting in delayed diagnosis, injury complication, prolonged pain and disability, and the likelihood of permanent medical issues.

## JURISDICTION

2. This action is brought pursuant to 42 U.S.C. § 1983. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 2201 because it is brought to seek relief

1

and/or damages for the deprivation, under color of state law, of the rights guaranteed by the Constitution of the United States and federal law.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the events giving rise to the claims herein occurred in this judicial district.

## PARTIES

4. Plaintiff SHAMIR LEFLORE is a citizen of the United States and currently resides in Ulster County, New York.

5. Defendant COUNTY OF ALBANY is a municipal corporation duly incorporated under the laws of the State of New York, with its principal place of business being at 112 State Street, Albany, New York 12207, and was at all times relevant hereto the employer and/or principal of the Defendants.

6. At all times relevant herein, Defendant CORRECTIONAL MEDICAL CARE, INC. was and remains the official provider of medical services for the Albany County Correctional Facility, with its corporate offices at 920 Harvest Drive, Suite 120, Blue Bell, Pennsylvania 19422.  Defendant Correctional Medical Care provides these medical services pursuant to a contract with the County of Albany.

7. At all times relevant herein, Defendant EMRE UMAR was and remains the President of Correctional Medical Care, Inc., with his principal place of business being 920 Harvest Drive, Suite 120, Blue Bell, Pennsylvania 19422.

8. Upon information and belief, Defendant S. AZAZ HAIDER-SHAH, M.D. was employed at all times relevant herein until approximately September 10, 2013 as the facility physician at the Albany County Correctional Facility, through the County of Albany's contract with Correctional Medical Care, Inc., providing medical services to the inmates

2

of the Albany County Correctional Facility, with his principal place of business being the Albany County Correctional Facility, 840 Albany-Shaker Road, Albany, New York 12211.

9. Upon information and belief, Defendant SILVER NOAHSON MASABA, M.D. was and remains, at all times relevant herein since approximately September 10, 2013, employed as the facility physician at the Albany County Correctional Facility, through the County of Albany's contract with Correctional Medical Care, Inc., providing medical services to the inmates of the Albany County Correctional Facility, with his principal place of business being the Albany County Correctional Facility, 840 Albany-Shaker Road, Albany, New York 12211.

10. Upon information and belief, Defendant ANNA PAULINO was at all times relevant herein employed as a nurse practitioner at the Albany County Correctional Facility, through the County of Albany's contract with Correctional Medical Care, Inc., providing medical services to the inmates of the Albany County Correctional Facility, with her principal place of business being the Albany County Correctional Facility, 840 Albany-Shaker Road, Albany, New York 12211.

11. At all times relevant herein, Defendant CRAIG APPLE was and remains employed as the Albany County Sheriff, with his principal place of business being the Albany County Sheriff's Office, 6 Lodge Street, Albany, New York 12207. Defendant Apple was and remains in charge of the operations of the Albany County Sheriff's Office and the Albany County Correctional Facility and is responsible for establishing, instituting, and enforcing the policies, procedures, and practices of the Albany County Sheriff's Office and the Albany County Correctional Facility.

12. At all times relevant herein, Defendant CHRISTIAN CLARK was and remains the Superintendent of the Albany County Correctional Facility. Defendant Clark is responsible for the day-to-day operations of the Albany County Correctional Facility. The principal place of business of Defendant Clark is the Albany County Correctional Facility, 840 Albany-Shaker Road, Albany, New York 12211.

13. At all times relevant herein, the individual Defendants acted in the scope of their authority as public servants for the Albany County Sheriff's Office and the County of Albany.

14. At all times relevant herein, the individual Defendants acted under color of law, to wit, under the color of the Constitution, statutes, laws, rules, regulations, ordinances, charters, customs, policies, and usages of the State of New York and the County of Albany.

**FACTS**

15. On or about the afternoon of June 29, 2013, while incarcerated as a pre-trial detainee at the Albany County Correctional Facility (ACCF) in Albany, New York, Plaintiff Shamir Leflore injured his right knee after falling while playing basketball in the recreation yard.

16. Mr. Leflore heard a "pop" sound from his knee when he fell.

17. As Mr. Leflore was unable to put weight on his right leg, he was transported by wheelchair to the medical unit.

18. At that time, and to date, medical care for ACCF inmates was provided by Defendant Correctional Medical Care, Inc., through a contract with Defendant County of Albany.

19. Mr. Leflore reported to medical staff his symptoms, including the "pop" sound his knee made when he fell. His knee also became swollen and black and blue and appeared "pushed-in" or out-of-place, he was in significant pain, and he did not have full range of

4

motion in his knee. In addition, Mr. Leflore was also unable to actively extend (straighten) his knee against gravity, and could not bear weight on it.

20. Upon information and belief, these are all signs of a patellar tendon rupture. In particular, a kneecap that appears indented or out-of-place and an inability to actively extend the knee are signs of a complete patellar tendon rupture.

21. Upon information and belief, a complete patellar tendon rupture is a disabling injury that requires surgical intervention to reattach the tendon to the patella. Also, upon information and belief, the prognosis of a patellar tendon rupture is significantly impacted by time between the injury and the intervention, with delays of a few weeks limiting recovery.

22. Although Mr. Leflore showed classic symptoms of a complete patellar tendon rupture, medical staff did not send him to the emergency room or request an immediate exam by a physician. Instead, an x-ray was ordered for two days later and Mr. Leflore was given an ice pack, Tylenol, and Motrin, and admitted to the facility's infirmary.

23. On July 1, 2013, Defendant Dr. S. Azaz Haider-Shah, the facility physician at that time, examined Mr. Leflore and reviewed the x-ray report of Mr. Leflore's knee.

24. Defendant Dr. Haider-Shah told Mr. Leflore that his knee was not broken, and although Mr. Leflore's knee was visibly deformed, extremely painful, black and blue, swollen, and he was unable to actively extend it, he diagnosed Plaintiff with "water on the knee."

25. Mr. Leflore was prescribed thirty more days of Motrin and Tylenol and discharged back to his tier with an ice pack. At some point, he was also given a bandage to wrap around his knee.

26. Over the next two and a half months, Mr. Leflore was in constant pain, which caused him sleeping difficulties, and he was unable to put weight on his right knee. His knee also

retained its "pushed in" appearance and remained swollen, and he remained unable to actively extend it.

27. Mr. Leflore's right leg muscles also atrophied due to lack of use, and they were visibly smaller than those on his left leg. The physical limitations of his knee made it very difficult for Mr. Leflore to engage in daily activities, including showering, and he was unable to do much besides sit in pain in his cell all day.

28. Between July and September 2013, Mr. Leflore submitted at least eight sick slips and a grievance requesting treatment for his injury and pain, requesting to be seen by a physician, informing the medical department that his knee was still swollen and that he had developed muscle atrophy, numbness, tingling, and muscle spasms in his knee and leg, expressing his concerns that something was wrong and that his injury would heal improperly, and requesting medical treatment.

29. On July 29, 2013, he submitted a sick slip requesting that his medication be renewed because his knee was still in pain.

30. The following day, Defendant Anna Paulino, Nurse Practitioner, ordered Mr. Leflore to take Motrin for two more weeks. However, upon information and belief, Mr. Leflore was not evaluated by a physician, nor was he actually given a single dose of Motrin or any other pain medication until August 16.

31. On August 5, 2013, Mr. Leflore submitted another sick slip requesting medical treatment for the ongoing pain in his knee. The nurse who assessed Mr. Leflore in response to this sick slip noted that he was already on Motrin and wore knee support. However, Mr. Leflore was not actually receiving any Motrin.

32. On August 14, 2013, Mr. Leflore submitted another sick slip requesting medical attention for his knee.

33. The following day, Defendant Paulino acknowledged that Mr. Leflore had pain, difficulty walking, decreased range of motion in his knee, and zero active extension of his knee. Nonetheless, he/she assessed Mr. Leflore's injury as a knee sprain and recommended he continue with Motrin, a knee brace, and rest and elevation of the knee.

34. Defendant Paulino also discontinued the Motrin order and prescribed Mobic for two weeks.

35. On August 21, 2013, Mr. Leflore submitted a sick slip again requesting medical attention because his knee was still swollen and he was unable to lift it.  He also noted the loss of muscle mass in his leg because he could not use or move his leg normally, and he stated his concerns that it may not heal properly and that something was wrong because it had been about a month and a half since the injury.  The nurse's assessment in response to this sick slip indicated that his knee was still swollen and that he was to see the physician.

36. On August 23, 2013, after submitting four sick slips about the ongoing problems with his knee, and after not being examined by a physician for 53 days, a physician finally saw Mr. Leflore.

37. Defendant Dr. Haider-Shah acknowledged that Mr. Leflore could not extend his right knee but diagnosed him with a partial tear of the right patellar tendon, and he ordered an orthopedic consult on a non-emergency, non-expedited basis.

38. Upon information and belief, the inability to extend the knee is a classic symptom of a complete patellar tendon rupture, not a partial rupture.  In addition, a partial rupture is in itself a serious injury.

39. Despite the serious, albeit incorrect diagnosis, the fact that Mr. Leflore's injury had gone untreated for nearly two months, and the fact that the longer the delay in treatment, the poorer the outcome, Defendant Dr. Haider-Shah did not even treat Mr. Leflore for a

7

partial rupture, he did not send Mr. Leflore to the hospital or to the emergency room, he did not expedite the orthopedic consult, and he did not take any other step to provide Mr. Leflore with timely and appropriate medical care. Instead, he ordered knee support and sent Mr. Leflore back to his cell.

40. In fact, medical staff did not even make the consult until September 3, 11 days after Defendant Dr. Haider-Shah ordered it, and 64 days after Mr. Leflore was initially injured. The consult appointment was scheduled for September 17, 2013.

41. On August 25 and August 26, 2013, Mr. Leflore submitted two more sick slips requesting medical attention for his knee. Mr. Leflore was referred back to, but not actually seen by, the facility physician.

42. Mr. Leflore submitted another sick slip on August 31, 2013 requesting medical attention for his knee. He was assessed with chronic knee pain, and again referred to the facility physician.

43. On September 7, 2013, Mr. Leflore submitted his eighth sick slip about his knee. Medical staff deferred Mr. Leflore's request for medical attention.

44. On September 10, 2013, Defendant Dr. Silver Noahson Masaba examined Mr. Leflore. Upon information and belief, Dr. Masaba replaced Dr. Haider-Shah as the facility physician at the ACCF.

45. Mr. Leflore complained to Defendant Dr. Masaba of pain in his right knee, and of his knee giving out and locking. Defendant Dr. Masaba acknowledged that Mr. Leflore's knee was "deformed and puffy," that he was unable to extend his leg, and that his patellar tendon was "defective."

46. Despite this, Defendant Dr. Masaba did not send Mr. Leflore to the emergency department or hospital, there is no indication that he requested the orthopedic consult or

any other treatment be expedited, and he failed to take any other steps to ensure Mr. Leflore received appropriate or timely medical treatment for his injury.

47. Instead, he renewed Mr. Leflore's Mobic prescription for seven more weeks, ordered continued use of the knee bandage, and sent Mr. Leflore back to his cell.

48. In fact, although both defendant doctors acknowledged that Mr. Leflore's patellar tendon was ruptured, and although both knew or should have known that delayed repair of such an injury increases the likelihood of unsuccessful repair, surgical complications, poor outcomes, and poor prognosis, both failed to provide him with timely or adequate medical treatment for his injury.

49. On September 16, 2013, after submitting several sick slips and with his symptoms either persisting or worsening since his injury, Mr. Leflore filed a grievance. Mr. Leflore was told that grievance forms were not available and that he would have to write out his grievance on paper, which he did.

50. The following day, more than two and a half months after he seriously injured his knee, nearly a month after Defendant Dr. Haider-Shah diagnosed first him with a patellar tendon tear, and a week after Defendant Dr. Masaba noted his defective tendon and deformed knee, Mr. Leflore was finally brought to the orthopedic physician.

51. Upon physical examination, the orthopedic physician noted the "palpable defect" in Mr. Leflore's patellar tendon as well as the fact that he was unable to actively extend his right knee.

52. The physician diagnosed Mr. Leflore with a right patellar tendon rupture, and sent him to the emergency room for surgery.

53. At the hospital, Mr. Leflore was examined and x-rays were taken, and his patella was noted to be in an abnormally high position. Upon information and belief, Mr. Leflore's

patella was in an abnormally high position because the tendon, which keeps the patella in a normal position, had been completely torn from it.

54. A physician also noted that the x-ray showed an "obvious patellar tendon rupture" and diagnosed Mr. Leflore with "chronic patellar tendon rupture." Upon information and belief, a patellar rupture becomes "chronic" when it is not timely diagnosed or treated/repaired.

55. Mr. Leflore had surgery to repair his patellar tendon rupture on September 18, 2013.

56. Because Mr. Leflore's treatment had been delayed for so long, his patellar tendon had to be grafted with a cadaver's Achilles tendon.

57. Mr. Leflore was hospitalized for nearly a week, from September 17 to September 22, 2013. He was discharged back to the ACCF with orders for Flexeril and Percocet for pain, and Augmentin for infection prevention.

58. Medical staff at the ACCF ordered Augmentin, Motrin and Tylenol, and five days (fifteen doses) of Flexeril for Mr. Leflore.

59. Nonetheless, for two days after his return to the ACCF from the hospital, Mr. Leflore received only Motrin and Tylenol for his severe post-surgical pain. He did not receive Flexeril until September 24, three days after he returned to the ACCF.

60. In addition, medical staff failed to provide Mr. Leflore with Flexeril, Tylenol, Motrin, or any other pain medication from September 28 until mid-day October 1, leaving him in serious pain.

61. On September 30, Mr. Leflore submitted a sick slip complaining of severe pain and stating that he was not receiving any pain medication. Although medical staff had only administered eight of the fifteen doses of Flexeril to Mr. Leflore, and sufficient doses should have remained to last through the morning of October 1, medical staff

inexplicably ran out of his remaining doses and deferred his request for pain medication pending its re-order.

62. After his surgery, Mr. Leflore wore a full leg cast for approximately seven weeks, and he required crutches to walk. Even after the cast was removed, Mr. Leflore still required crutches for another month, and he continues to need a cane. He also had to be fitted with a special leg brace to gradually increase his ability to bend his knee, and he continues to receive medical treatment, including physical therapy, for this injury.

63. Mr. Leflore needlessly suffered and endured prolonged, serious pain and injury as a direct result of the actions and inactions of Defendants Dr. Haider-Shah, Dr. Masaba, Paulino, and other Correctional Medical Care, Inc. staff at the ACCF.

64. Defendant Correctional Medical Care, Inc. has a history of delaying and denying clearly warranted medical care to inmates in its care.

65. According to several reports by the press and by the New York State Commission of Correction, Defendant Correctional Medical Care, Inc. has been faulted in the deaths of nine inmates at facilities in New York State where it is contracted to provide medical care.

66. Commission of Correction reports have also faulted Correctional Medical Care, Inc. for its gross negligence, gross incompetence, improper and inadequate medical care, and its failures to implement its own policies, to make adequate records, and to have physician evaluations.

67. In addition, in several of these reports have specifically recommended that counties and/or sheriffs inquire into Correctional Medical Care, Inc's. fitness as a provider of medical care to inmates.

68. The Commission of Correction has also made specific recommendations to Defendant Emre Umar regarding the adequacy and quality of medical care his company provides.

69. Based on these reports, Defendants Correctional Medical Care, Inc., Umar, County of Albany, Sheriff Craig Apple, and Superintendent Clark were or should have been aware of the deficiencies in medical care provided by Correctional Medical Care, Inc. and of the risk of its continued provision of medical services to ACCF inmates.

70. Despite this, however, upon information and belief none of these Defendants required or requested additional oversight or supervision; review, revision, or implementation of policies; steps to ensure existing policies were being properly followed; additional training; or other steps to ensure that Correctional Medical Care, Inc. and its employees were providing adequate medical care to ACCF inmates or to prevent further or future violations of inmates' right to adequate medical care while incarcerated at the ACCF.

71. In addition, upon information and belief, Defendant County of Albany continues to outsource its medical care responsibilities to ACCF inmates to Correctional Medical Care, Inc. and has taken no adverse action against the company.  And Defendant Sheriff Apple was also quoted in press reports in 2012 and 2013 stating, respectively, that the ACCF has "state of the art medical" and that he was "very comfortable" with Correctional Medical Care, Inc.

72. Mr. Leflore continues to suffer from his injuries, including limited range of motion and weakness in his right knee and leg, and he continues to receive medical treatment for these injuries.  Because of his physical limitations, including the fact that he still cannot use stairs, Mr. Leflore's ability to participate in programs and activities, and his ability to engage in normal daily activities remains limited.  Mr. Leflore's ability to engage in these activities in the future is also uncertain.

73. As a result of the delayed and inadequate treatment of his injury, Mr. Leflore, who was 29 years old at the time of his injury, is likely to have permanent weakness in his right knee, permanent or long-term inability to fully extend his right knee, permanent or long-term stiffness, permanent or long-term poor range of motion, the potential need for repeated surgery, the potential failure of the cadaver tendon, and chronic pain, among other issues.

## CAUSES OF ACTION

### AS AND FOR A FIRST CAUSE OF ACTION AGAINST DEFENDANTS DOCTOR HAIDER-SHAH, DOCTOR SILVER NOAHSON MASABA, ANNA PAULINO, AND CORRECTIONAL MEDICAL CARE, INC.

**Violation of Constitutional Rights Under Color of State Law**
**Failure to Provide Medical Treatment/Deliberate Indifference to Serious Medical Needs**

74. Plaintiff incorporates by reference and realleges each and every allegation as stated in paragraphs 1 to 73.

75. The Eight and Fourteenth Amendments of the Constitution of the United States prohibit jail officials from deliberately denying medical treatment to an inmate with serious medical needs.

76. As heretofore described, the Plaintiff had clear and serious medical needs which were deliberately ignored by the above-named Defendants.

77. Defendant Dr. Haider-Shah failed to adequately examine the Plaintiff, failed to adequately investigate his injuries or symptoms, failed to properly diagnose his serious knee injury for approximately seven weeks, failed to adequately treat his injury once he did diagnose it, and failed to provide him with adequate treatment for his severe pain and injury pre-surgery.

78. Defendant Dr. Masaba failed to adequately treat the Plaintiff's serious injury, failed to provide him with appropriate medical treatment once he diagnosed his injury, and failed to provide him with adequate treatment for his severe pain and injury both pre and post-surgery.

79. Defendant Anna Paulino failed to adequately treat the Plaintiff's serious injury or to provide him with appropriate medical care for his injury and severe pain.

80. As the private entity responsible for providing medical care to inmates at the ACCF on behalf of the County of Albany, Defendant Correctional Medical Care, Inc. is liable for the heretofore described actions of its employees, Defendants Dr. Haider-Shah, Dr. Masaba, and Anna Paulino.

81. The actions and inactions of the above-named Defendants were objectively unreasonable, deliberately indifferent to the Plaintiff's serious medical needs, motivated by malice and or gross negligence, and subjected the Plaintiff to unnecessary, prolonged, and severe pain and injury.  The Plaintiff continues to suffer from his injuries.

82. The aforementioned actions and inactions of the above-named Defendants, taken under color of state law, violated the Plaintiff's right to be free from cruel and unusual punishment, and are also a violation of 42 U.S.C. § 1983.

83. As a direct and proximate result of the unconstitutional acts described above, the Plaintiff has been irreparably injured.

**AS AND FOR A SECOND CAUSE OF ACTION AGAINST DEFENDANTS COUNTY OF ALBANY, CORRECTIONAL MEDICAL CARE, INC., EMRE UMAR, CRAIG APPLE, AND CHRISTIAN CLARK,**

**Violation of Constitutional Rights Under Color of State Law**

**Implementation of Policies that Directly Violate Constitutional Rights/Failure to Implement Policies and Practices to Avoid Violations of Constitutional Rights and Failure to Train/Supervise Employees and Agents**

84. Plaintiff incorporates by reference and realleges each and every allegation as stated in paragraphs 1 to 83.

85. Defendants County of Albany, Correctional Medical Care, Inc., Umar, Apple, and Clark, are accountable for the policies, procedures, and practices, actions, hiring, and supervisory decisions of their policy makers, including those that pertain to the medical care of inmates at the ACCF.

86. Defendants Correctional Medical Care, Inc. and Umar are accountable for the policies, procedures, practices, hiring and supervisory decisions, and actions and inactions of its employees at the ACCF.

87. Upon information and belief, the above-named Defendants have failed to institute and implement appropriate policies at the ACCF to ensure inmates at the ACCF receive adequate medical care, and have failed to provide appropriate supervision and training to persons providing medical care at the ACCF.

88. In the alternative, and upon information and belief, the above-named Defendants have instituted policies addressing these topics but have, through gross negligence demonstrated deliberate indifference to inmates at the ACCF by failing or refusing to enforce these policies, failing to provide appropriate supervision and training, and deliberately ignoring repeated violations of inmates' right to adequate medical care.

89. The above-named Defendants have also, upon information and belief, failed to adequately hire, screen, or supervise medical staff, or to provide adequate training regarding their duties as they relate to the Constitutional rights of inmates in their care to receive adequate medical care.

90. In accordance with their policies, customs, or practices, and/or through their failures to act on information indicating violations were occurring, and/or through their gross negligence in supervising their subordinates, the above-named Defendants caused and allowed Plaintiff's Constitutional rights to be violated over the course of several months by failing to provide him with adequate medical care for his serious injury, causing him prolonged and serious pain and injury.

91. As heretofore described, the above-named Defendants were aware of Correctional Medical Care, Inc.'s history of violations, negligence, and deliberate indifference with regard to the medical care it provided to inmates, yet failed to act on this information.

92. The actions and inactions of the above-named Defendants, taken under color of state law, violated the Plaintiff's right to be free from cruel and unusual punishment as guaranteed to him under the Eighth and Fourteenth Amendments of the Constitution of the United States, and are also a violation of 42 U.S.C. § 1983.

93. As a direct and proximate result of the unconstitutional acts described above, the Plaintiff has been irreparably injured.

## DEMAND FOR PUNITIVE DAMAGES

94. The actions and inactions of the Defendants as described were extreme, outrageous, and shock the conscience of a reasonable person and an award of punitive damages is appropriate. Punitive damages are not sought from the County of Albany.

## DEMAND FOR TRIAL BY JURY

95. The Plaintiff hereby demands a trial by jury.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff Shamir Leflore requests that this Honorable Court grant him the following relief:

A. A judgment in favor of the Plaintiff against all Defendants for compensatory damages in an amount to be determined by a properly charged jury;

B. A judgment in favor of the Plaintiff against all Defendants except the County of Albany for punitive damages in an amount to be determined by a properly charged jury;

C. A monetary award for attorney's fees and the costs of this action pursuant to 42 USC § 1988;

D. Any other relief this Court finds to be just, proper, and equitable.

Dated:  May 15, 2015
       Albany, New York

Respectfully submitted,

s/ **Jessica M. Gorman**
Jessica M. Gorman
USDC NDNY Bar Roll No.: 516068
Law Office of Jessica M. Gorman
90 State Street, Suite 700
Albany, New York 12207
T: 518-795-5022
F: 518-514-1180
Electronic mail:
jmgorman@jmgormanlaw.com

**ATTORNEY FOR THE PLAINTIFF
SHAMIR LEFLORE**